UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
HAMMOND DIVISION

| GEORGE OSSEI ASSIBEY-MENSAH, | ) | |
|---|---|---|
| Plaintiff, | ) | |
| vs. | ) | 2:13CV260-PPS |
| INDIANA UNIVERSITY BOARD OF TRUSTEES, | ) | |
| Defendant. | ) | |

## OPINION AND ORDER

George Ossei Assibey-Mensah contends in this *pro se* employment discrimination case that his former employer, the Indiana University Board of Trustees, terminated his employment as an associate professor at Indiana University Northwest based on his race (Black) and his national origin (Ghanaian). The Trustees say he was fired for sexually harassing his female students, among other reasons. The Trustees seek summary judgment which I will grant because there is simply no evidence that Assibey's race or national origin played any role in his dismissal from the university.

### Motions to Strike

There are two motions to strike that need to be addressed before getting to the merits of the case. The Trustees ask me to strike Assibey's filings opposing the summary judgment motion as untimely. [DE 46, 47.] Assibey's summary judgment opposition was in fact filed late. [DE 44, 45.] After Assibey's counsel was allowed to withdraw and I explained to Assibey that I would not appoint him counsel at that juncture, I granted him a substantial 45-day extension of time in which to respond to the

summary judgment. [DE 43.] That extension was to November 13, but Assibey didn't file his summary judgment opposition until November 19. He did so without asking leave to file late and without offering any explanation. Assibey has not responded to the motion to strike. Nonetheless, the Trustees have not been prejudiced by Assibey's lateness, given the two extensions of time I granted the Trustees to file their reply in support of summary judgment. [DE 49, 52.] I am not persuaded to strike Assibey's summary judgment responses due to untimeliness.

Of greater concern to the Trustees might be the other object of this motion to strike, namely the language in Assibey's opposition asking for summary judgment in his favor. [DE 44 at 1.] I do not construe that language as an actual attempt to move the court for summary judgment, but in any event I agree with the Trustees that any such effort at that point would have been substantially untimely, coming months after the dispositive motions deadline. To allow an untimely dispositive motion months after the deadline is substantially more prejudicial to the opponent than allowing a untimely response six days late. So to the extent it might be necessary, the motion to strike any effort by Assibey to lodge his own summary judgment motion will be granted.

The Trustees' other motion to strike [DE 50] challenges various pieces of evidentiary support Assibey proffers in opposition to the Trustees' motion. Again Assibey has not responded to the motion to strike. The Trustees complain that affiants Robert Buggs, Chauncre Sprouse and Mary Jenkins were not identified in pretrial disclosures and discovery as they should have been, with the result that Assibey is not

allowed to use their evidence now.   Rule 37(c)(1) of the Federal Rules of Civil Procedure provides:

> If a party fails to provide information or identify a witness as required by Rule 26(a) or (e), the party is not allowed to use that information or witness to supply evidence on a motion, at a hearing, or at a trial unless the failure was substantially justified or is harmless.

The rule's reference to Rule 26(a) is to the requirement that each party disclose the name "of each individual likely to have discoverable information...that the disclosing party may use to support its claims or defenses."  Rule 26(e) then requires that the initial disclosure of that information, or an initial response to any discovery request, must be supplemented over time if a party learns additional responsive information.  Besides Assibey's responsibility under Rule 26 to disclose his witnesses, the Trustees also propounded interrogatories that should have uncovered these individuals – one on fact witnesses in general and the other on University students or employees interviewed by Assibey in relation to the lawsuit.  [DE 51 at 2.]  Assibey did not previously disclose Buggs, Sprouse or Jenkins as potential witnesses or in response to these interrogatories. [*Id.* at 1, 2.]

By failing to respond to the motion to strike, Assibey has clearly not demonstrated that his failure to previously identify these potential witnesses was substantially justified or harmless.  Where those excuses are not successfully made, "[t]he exclusion under Rule 37(c)(1) is automatic and mandatory." *Logan v. Gary Community School Corporation*, 2008 WL 5062802, *4 (N.D.Ind. 2008) (Cherry, M.J.).  *See*

3

*also David v. Caterpillar, Inc.*, 324 F.3d 851, 857 (7th Cir. 2003), citing *Salgado v. Gen. Motors Corp.*, 150 F.3d 735, 742 (7th Cir. 1998). The rules governing mandatory disclosures and party-devised discovery are designed to prevent evidentiary ambush, and the sanctions authorized or required by those rules play an important role in making a federal case "less a game of blindman's buff and more a fair contest with the basic issues and facts disclosed to the fullest practicable extent." *United States v. Proctor & Gamble Co.*, 356 U.S. 677, 682 (1958).

So the affidavits of Buggs [DE 45 at 20-23], Sprouse [DE 45 at 24-28] and Jenkins [DE 45 at 29-31] will be stricken under Rule 37(c)(1). This conclusion obviates the need to discuss other shortcomings of the affidavits, which might have required a more surgical treatment, excluding numerous particular passages in the affidavits because they are not based on personal knowledge, are hearsay or are otherwise inadmissible. Fed.R.Civ.P. 56(c)(4); *Miller v. Javitch, Block & Rathbone, LLP*, 397 F.Supp.2d 991, 996 (N.D.Ind. 2005) (Springmann, J.).

The Trustees also challenge a number of Assibey's exhibits (A, C, G, H, J and K). Materials cannot be considered in connection with a summary judgment motion unless they are properly authenticated and would be admissible as exhibits at trial. *Smith v. City of Chicago*, 242 F.3d 737, 741 (7th Cir. 2001). Authentication requires "support [for] a finding that the item is what the proponent claims it is." Fed.R.Evid. 901(a). The exhibits challenged are letters, emails and one memo all between members of the University community. For purposes of the summary judgment motion, I find "the

4

appearance, contents, substance, internal patterns, [and] other distinctive characteristics" of these documents, "taken together with all the circumstances," to be sufficient to substantiate the authenticity of the documents.

Of greater concern is the Trustees' argument that each of these exhibits contains inadmissible hearsay. Rather than attempt a line-by-line analysis of the hearsay issue here, I will bear the objection in mind as I proceed to analyze the parties' summary judgment arguments. So the Trustees' Motion to Strike Affidavits and Other Exhibits from Plaintiff's Response [DE 50] will be granted in part with respect to the affidavits of Buggs, Sprouse and Jenkins, and otherwise denied.

## **Motion for Summary Judgment**

Summary judgment is appropriate where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). This means that if, after construing the record in the light most favorable to Assibey, I conclude that no reasonable jury could rule in Assibey's favor, I must grant the Trustees' motion and enter judgment against Assibey. *Bagwe v. Sedgwick Claims Management Services, Inc.*, 811 F.3d 866, 879 (2016). This stage of the case requires the plaintiff – who ultimately bears the burden to support his claims by a preponderance of the evidence – to "put up or shut up" and "show what evidence [he] has that would convince a trier of fact to accept [his] version of events." *Olendzki v. Rossi*, 765 F.3d 742,

5

749 (7th Cir. 2014)(internal quotation marks omitted) (quoting *Steen v. Myers*, 486 F.3d 1017, 1022 (7th Cir. 2007)).

**Procedural Matters**

The procedures governing motions for summary judgment are designed to enable the court to determine which material facts are genuinely in dispute. For instance, the court's Local Rule 56.1(a) requires that the Trustees, as the moving party, "include a section labeled 'Statement of Material Facts' that identifies the facts that the moving party contends are not genuinely disputed." The Trustees have complied with this rule by filing a 17-page "Statement of Undisputed Material Facts." [DE 40 at 4-21.] Federal Rule 56(c)(1) requires that a party asserting a fact must "cit[e] to particular parts of materials in the record." That means each fact put forth by one of the parties must be supported by a citation to some evidence in the record, whether an affidavit, exhibit, disclosure or discovery response. The Trustees have also complied with this requirement, by citing to a deposition, affidavit, exhibit or discovery response to support each of the facts asserted in the 63 numbered paragraphs of their Statement of Undisputed Material Facts.

For his part, Assibey as the opposing party was required by Local Rule 56.1(b)(2) to "include a section labeled 'Statement of Genuine Disputes' that identifies the material facts that the party contends are genuinely disputed so as to make a trial necessary." Assibey filed two separate documents in response to the summary judgment motion – his summary "Opposition to Defendant's Summary-Judgment Motion" [DE 44] and his

6

longer "Brief in Support of Plaintiff's Opposition to Defendant's Motion for Summary Judgment" that includes the affidavits and exhibits he offers [DE 45]. Neither of Assibey's filings contains the required "Statement of Genuine Disputes." Instead, Assibey's Brief [DE 45] contains 11 pages of "Argument" in which Assibey offers, in long-form prose, his assertions as to the facts of his employment and termination by the Trustees, with only occasional citations to the exhibits he has proffered. Assibey has failed to cite to evidence in the record to support almost all of his factual assertions.

For example, Assibey makes contentions about the more favorable treatment he says was received by similarly situated white American employees, namely David Steel, Ellen Szarleta, Samuel Flint and Linda Delunas. [DE 45 at 4-7.] But Assibey offers no admissible evidence in support of his factual assertions about the circumstances and treatment of these individuals, but merely pages of his bald narrative without citations to any evidence of record. Furthermore, he is unable to assert, much less support with evidence, that each of these employees was directly comparable to Assibey in all material respects, but treated differently. *Bagwe*, 811 F.3d at 884.

In addition to failing to support his own assertions, Assibey's approach fails to do what the rules require in order to dispute a fact that the Trustees have properly asserted with supporting evidence. To establish a genuine dispute of any of the Trustees' properly supported facts, Assibey must show "that the materials cited do not establish the absence...of a genuine dispute." Fed.R.Civ.P. 56(c)(1)(B). Assibey does not argue that any of the Trustees' evidence is insufficient to support their positions.

7

Federal Rule 56(e) addresses a party's failure "to properly support an assertion of fact or…properly address another party's assertion of fact." Under Rule 56(e)(2) and (3), I can consider the Trustees' assertions "undisputed for purposes of the motion," and then "grant summary judgment if the motion and supporting materials – including the facts considered undisputed – show that the movant is entitled to it."

### The Undisputed Facts

Given Assibey's failure to establish a genuine dispute as to any of the Trustees' asserted facts, along with Assibey's agreement to many of the salient facts, the material facts that are undisputed for purposes of the summary judgment motion include the following. Assibey was a professor at Indiana University Northwest from 1994 until his employment was terminated in July of 2012. [DE 40-24 at 8.] As an assistant professor, Assibey taught courses in public finance and budgeting. [*Id*.]

In the fall of 2000, a female undergraduate student lodged a complaint about Assibey with the University's affirmative action officer, Delores Rice. [*Id*. at 12.] Assibey acknowledged at the time, and continues to do so, that he had kissed the student on the face, referred to her as "sweetheart," and told her he thought he had fallen in love with her. [*Id*. at 13; DE 45 at 2.] Assibey has also acknowledged that such behavior by a professor is inappropriate and unacceptable. [DE 40-24 at 9-10, 25.] As a result of the incident, Assibey was suspended from teaching for the rest of the fall semester, with pay, and required to have counseling regarding sexual harassment. [*Id.* at 16, 21-22, 65-66.] The University warned Assibey that any additional confirmed reports of

inappropriate behavior could result in further discipline, up to and including proceedings to terminate his position. [*Id*. at 66.] Assibey's grievance challenging his suspension was denied by the Faculty Board of Review. [*Id.* at 19-20.]

In summer 2011, another female student complained to the University that, because she declined his offer to take her to dinner, Assibey refused her request for materials from a class she missed. [*Id.* at 27-28; DE 40-8 at 2-3.] The student also reported that Assibey had made her uncomfortable by asking her for personal information she didn't want to disclose, such as where she lived, whether she was single, and how many children she had. [DE 40-8 at 2.] The Affirmative Action Director who interviewed both Assibey and the student found her account of the events more credible. [*Id*. at 3.]

In the course of the 2011 investigation, Assibey disclosed that he had all of his students complete a questionnaire he called a "Familiarity Form," providing him with their marital status, phone number, disabilities and other personal information. [*Id*.; DE 40-10 at 2.] Assibey later acknowledged that he had used some of the information he obtained in the Familiarity Form to contact students about participating in a family business venture, involving sales of vitamin supplements and weight loss products. [DE 40-10 at 2; DE 40-11 at 3.] Assibey has acknowledged that such solicitation of students could be perceived as a conflict of interest and inappropriate behavior for a professor. [DE 40-24 at 26.] The University also believed Assibey's use of the Familiarity Form violated the Family Educational Rights and Privacy Act. [DE 40-1 at 3; DE 40-17 at 3.]

9

There were other problems with Assibey that his supervisors encountered. Assibey's faculty supervisor, Dr. Barbara Peat, questioned the validity of the course evaluations Assibey collected after a class in summer 2011. [DE 40-10 at 3.] A student who came to Dr. Peat with complaints about the class had completed a negative evaluation that was not included in the course evaluations Dr. Peat routinely reviewed as Assibey's faculty supervisor. [*Id.*]

There's more. The University had concerns about Assibey's conduct in violation of federal copyright laws and the school's Fair Use policy. Assibey had University employees make copies of an entire textbook for the University bookstore to sell to his students. [DE 40-24 at 33-35; DE 40-11 at 3.] In an another instance, Assibey made copies, and had copies made, of multiple chapters of another book, and then sold those excerpts to his students as a course text, pocketing the proceeds himself. [DE 40-12 at 4; DE 40-24 at 33-35.] Assibey has acknowledged that it is entirely reasonable for the University to expect its faculty not to expose the University to claims of copyright violation, and not to copy and sell copyrighted materials while employed by the school. [DE 40-24 at 35-36.]

All of these legitimate non-discriminatory concerns of the University led to Assibey's suspension from January 1 to July 31, 2012, and the recommendation of the Dean, Patrick Bankston, that Assibey withdraw his then-pending application for promotion to full professor. [DE 40-2 at 2-4; DE 40-12; DE 40-1 at 5-6.] After Assibey declined to withdraw his request for promotion, the Dean formally recommended

against Assibey's promotion. [DE 40-11 at 6; DE 40-13 at 2.] The suspension came with a warning that if Assibey was found to engage in any further prohibited behavior or misconduct, he would be immediately dismissed. Assibey's appeal of the suspension was denied by the Faculty Board of Review. [DE 40-16 at 3-4; DE 40-17.]

To justify Assibey's being paid while suspended from teaching and pending Assibey's appeal of the sanctions, Dr. Peat gave Assibey five academic assignments to complete. [DE 40-24 at 53-55; DE 40-10 at 3.] By February 23, 2012, Assibey had not completed two of the five assignments given to him in January. [DE 40-10 at 3.] What's more, Assibey actually off-loaded two of the assignments involving data compilation and analysis to a junior faculty member without any acknowledgment or attribution by Assibey. [DE 40-24 at 56-57; DE 40-10 at 4.] Dr. Peat and the Dean later learned that Assibey had relied on the junior professor to do this work, and that Assibey had instructed him not to tell Dr. Peat of his involvement. [DE 40-11 at 6-7; DE 40-15 at 2-3.] In subsequent meetings concerning the two projects, Assibey displayed a lack of knowledge about the data and analysis, but continued to conceal that the junior faculty member was the one who actually performed the surveys. [DE 40-11 at 6-7.]

This unprofessional behavior and failure to complete the assignments Assibey had been given were reported by the Dean to David Malik, the Executive Vice Chancellor of Academic Affairs. [DE 40-14 at 2-4.] Malik wrote to Assibey on March 8, 2012, requesting a meeting with Assibey, Dean Bankston and IUN Chancellor William Lowe to occur on March 26. [DE 40-4 at 2.] Assibey delayed the requested meeting

11

until May 25, 2012. [DE 40-1 at 7.] At that point, Assibey finally admitted for the first time that he delegated the two survey assignments to the junior faculty member without giving him attribution. [*Id.*]

Enough was enough. Considering the many (and continuing) instances of misconduct, Malik recommended to the Chancellor that Assibey's faculty appointment be terminated. [*Id.*] The Chancellor concurred and wrote to Assibey to advise him that his employment with IUN was terminated. [DE 40-18 at 2-3; DE 40-19 at 2.] Assibey invoked a review of the dismissal by a Conduct Characterization Committee. [DE 40-18 at 3; DE 40-24 at 60.] The Committee issued written findings and an opinion concluding that Assibey had engaged in serious misconduct that reflected he was unfit for academic appointment. [DE 40-6.] The Chancellor thereafter confirmed the termination of Assibey's employment by the University. [DE 40-18 at 3-4.]

**Discussion and Analysis**

Assibey's first amended complaint contains five claims. Counts I and II are brought under Title VII of the Civil Rights Act of 1964, and allege that the University imposed a hostile environment and terminated him on the basis of his race, color and national origin. Count III is a similar claim of discrimination and harassment based on race and national origin, but brought under 42 U.S.C. §1981. Count IV alleges that the same discrimination constituted a violation of Title VI of the Civil Rights Act of 1964, which requires non-discrimination in educational programs receiving federal financial assistance. Finally, Count V, brought under 42 U.S.C. §1983, contends that Assibey's

12

"civil right to request compliance without harassment where not otherwise provided for constitutes a First Amendment violation and a civil rights violation," including a violation of the Equal Protection clause. [DE 15 at 7.]

Although the five counts invoke a number of different causes of action, all of them are predicated on the same fundamental assertion, namely that Assibey was subjected to discipline in the form of suspension, and ultimately terminated from his job, based on his race and national origin. The "elements and methods of proof for §1981 claims are 'essentially identical' to those under Title VII." *Brown v. Advocate South Suburban Hospital*, 700 F.3d 1101, 1104 n. 1 (7th Cir. 2012), quoting *Montgomery v. Am. Airlines, Inc.*, 626 F.3d 382, 389 (7th Cir. 2010). In addition, "equal-protection claims alleging discrimination in public employment can be analogized to claims under Title VII" as well. *McCauley v. City of Chicago*, 671 F.3d 611, 616 (7th Cir. 2011).

Title VII forbids an employer "to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment" on the basis of race, color or national origin. 42 U.S.C. §2000e-2(a). A violation of Title VII can be demonstrated by either a direct or an indirect method. As a *pro se* plaintiff, Assibey does not use legal terminology to label the method of proof he relies upon so I will consider both possibilities.

"Under the direct method, the plaintiff must produce either direct or circumstantial evidence of discriminatory intent." *Brown v. Advocate South Suburban Hospital*, 700 F.3d 1101, 1104 (7th Cir. 2012). In the absence of direct evidence (Assibey

13

has none), "[t]he circumstantial evidence, taken together, 'must point directly to a discriminatory reason for the employer's action.'" *Bagwe,* 811 F.3d at 880, quoting *Adams v. Wal-Mart Stores, Inc.*, 324 F.3d 935, 939 (7th Cir. 2003). Under this route, Assibey "may avoid summary judgment only by presenting sufficient evidence that could lead a rational jury to conclude that [the University] fired him because of his race or national origin." *Tank v. T-Mobile USA, Inc.*, 758 F.3d 800, 805 (7th Cir. 2014).

Other than the mere fact of Assibey's race and national origin, which is obviously insufficient, Assibey has no evidence that could rationally support a conclusion that racial or national origin animus motivated his suspensions or his termination by IUN. Instead, the record is replete with evidentiary support for multiple transgressions of University policy and otherwise inappropriate and unacceptable conduct by Assibey. As I've already indicated, Assibey does not offer evidence of White American employees who received better treatment though similarly situated in terms of their misconduct. And although Assibey suggests alternative interpretations of what the University saw as his transgressions, I don't "sit as a 'super-personnel department,' second-guessing an employer's legitimate concerns about an employee's performance." *Mintz v. Caterpillar Inc.*, 788 F.3d 673, 680 (7th Cir. 2015).

Under the indirect method, Assibey would first be required to make a *prima facie* case of discrimination by showing that: (1) he is a member of one or more protected classes; (2) his job performance met the University's legitimate expectations; (3) despite his adequate performance, he was subjected to an adverse employment action; and (4)

the University gave favorable treatment to other similarly situated employees who were outside of Assibey's protected classes. *Eaton v. Indiana Dep't of Corrections*, 657 F.3d 551, 554 (7th Cir. 2011). The fourth element requires Assibey to demonstrate that the University treated him differently than "someone who is directly comparable to [him] in all material respects except for membership in the protected class." *Brown*, 700 F.3d at 1104. As the undisputed facts indicate, Assibey is unable to make the *prima facie* showing of adequate job performance. And as previously discussed, Assibey lacks proof of favorable treatment given to similarly situated White American colleagues.

In any event, even if Assibey were able to establish all four elements of the *prima facie* case, the Trustees clearly can meet the burden that then shifts to them, of offering legitimate, nondiscriminatory reasons for the adverse employment actions Assibey complains of. *Eaton*, 657 F.3d at 554. Because the Trustees can do so, "the presumption of discrimination falls away" and "plaintiff then has the burden of producing sufficient evidence to show that reason to be pretextual." *Stockwell v. City of Harvey*, 597 F.3d 895, 901 (7th Cir. 2010). To demonstrate that the University's multiple findings in support of his termination were a pretext for a discriminatory motive, Assibey must "identify such weaknesses, implausibilities, inconsistencies, or contradictions" that a reasonable person could find the reasons "unworthy of credence." *Coleman v. Donahoe*, 667 F.3d 835, 852 (7th Cir. 2012). A pretext means a lie, offered to hide the real reason for taking some action. *Smith v. Chicago Transit Authority*, 806 F.3d 900, 905 (7th Cir. 2015).

There is no evidence that the University's myriad concerns about Assibey's performance — student reports of sexual harassment, Assibey's use of the Familiarity Form, questions about Assibey's full disclosure of student evaluations, copyright concerns raised by the copying and resale of textbooks, Assibey's failure to complete the tasks assigned to him on suspension and his surreptitious reliance on junior faculty to do work he claimed as his own — were all a mere cover for discrimination against him because of his race or national origin.

In fact, Assibey does not dispute the facts on which the University based its discipline, but urges alternative innocuous interpretations of his conduct. For instance, he claims to have "accidentally kissed [the student] on the face," after she "excited and glad, quickly and suddenly initiated a surprising and unexpected hug to express her gratitude to plaintiff." [DE 45 at 2.] Calling the student "sweetheart," he says, "was his usual way of encouraging struggling female students." [*Id*.] So, Assibey contends his "motive of encouragement was misconstrued as sexual harassment," and a jury should have the opportunity to decide which it was. [*Id*.] As to the second student's complaint, he disputes that he asked her to dinner but acknowledges that she reported he did. Assibey says he used the "Familiarity Form" for 17 years to "assist[] him in writing reference letters for students seeking jobs, job promotions, admission to professional schools, and the like." [DE 45 at 3.] Assibey doesn't deny the copying of texts for distribution, but suggests it was "his own out-of-print textbook," that the university

made money on the sales, not him, and that the proceeds on the copies he made and sold himself were given to charity. [*Id.* at 4.]

But these kinds of argument misconstrue the analysis of his discrimination claim. Assibey must prove that he was the victim of discrimination based on his race or national origin. Whether or not the University correctly or accurately judged his conduct to be unacceptable is not at issue here, unless Assibey can "show that the employer's reason is not credible or factually baseless" and "provide evidence that supports the inference that the real reason was discriminatory." *Stockwell v. City of Harvey*, 597 F.3d 895, 901-02 (7th Cir. 2010). Employers can be wrong or even arbitrary without violating anti-discrimination laws: "even if the business decision was unreasonable, pretext does not exist if the decisionmaker honestly believed the nondiscriminatory reason." *Id*. at 902. As I noted above, and as has been repeatedly stated by the Seventh Circuit, courts and juries do not sit as "super-personnel departments" reviewing the soundness of an employer's business decisions about the conduct of its employees.

Assibey is unable to stave off summary judgment on his claims of discriminatory suspension and termination by either the direct or indirect method of proof. Assibey's hostile environment claim is also subject to summary judgment. The elements of a claim for a hostile work environment include that Assibey was the victim of severe or pervasive harassment based on his race or national origin that made the work environment both subjectively and objectively offensive, and that the University as his

17

employer is liable. *Huri v. Office of the Chief Judge of the Circuit Court of Cook County*, 804 F.3d 826, 834 (7th Cir. 2015); *Chaib v. Indiana*, 744 F.3d 974, 985 (7th Cir. 2014).

A "hostile environment" is one "permeated with discriminatory intimidation, ridicule, and insult." *Cooper-Schut v. Visteon Auto. Sys.,* 361 F.3d 421, 426 (7th Cir. 2004); *Shanoff v. Ill. Dept. of Human Services*, 258 F.3d 696, 704 (7th Cir. 2001). This claim is easily disposed of by summary judgment in the Trustees' favor, as the record contains no evidence that Assibey was harassed in the workplace, much less that he was harassed because he is Black or from Ghana, and still less that there was severe or pervasive harassment of that nature.

Out of an abundance of caution, I will briefly consider Count V's passing reference to the First Amendment. Count V contains the following allegation: "As to any of the statutory rights enumerated above without private rights of action, Plaintiff's civil right to request compliance without harassment where not otherwise provided for constitutes a First Amendment violation and a civil rights violation under 42 USC § 1983." [DE 15 at ¶32.] The meaning of this sentence is obscure, and it contains the pleading's only reference to the First Amendment. The remainder of Count V addresses the same claims of discrimination as are set out in the earlier counts, but treats them as supporting an Equal Protection claim. The Trustees have not addressed any First Amendment claim in their summary judgment motion, and in opposition Assibey mentions it only in his introductory summary of his case. [DE 45 at 1.]

18

In a public employment context, a First Amendment claim requires speech that is constitutionally protected under the applicable test[1] and was a substantial or motivating factor in some adverse retaliatory action by the government employer. *Lalowski v. City of Des Plaines*, 789 F.3d 784, 790 (7th Cir. 2015). Then the employer would have an opportunity to demonstrate that the same action would have been taken even in the absence of the protected speech. *Id*. I readily conclude that Assibey makes no viable claim under the First Amendment. He has not identified any speech, much less protected speech, that the University regulated or punished.

## Conclusion

The Trustees are entitled to judgment as a matter of law on Assibey's Equal Protection claims and claims of discrimination on the basis of Assibey's race, color and national origin, including a hostile environment, suspension and termination, as made in all five counts of Assibey's first amended complaint. Any First Amendment claim asserted in Count V is also subject to summary judgment. The Trustees' motion will be granted.

**ACCORDINGLY:**

---

[1] The applicable two-part test derives from two Supreme Court cases, *Connick v. Myers*, 461 U.S. 138 (1983) and *Pickering v. Bd. of Educ.*, 391 U.S. 563, 568 (1968).

Defendant Trustees' Motion to Strike as Untimely Plaintiff's Response to Defendant's Summary Judgment Motion [DE 46] is DENIED IN PART as to Plaintiff's Opposition to the Trustees' Motion for Summary Judgment, but is GRANTED IN PART as to any attempt by Plaintiff to offer his own motion for summary judgment by way of his opposition to the Trustees' summary judgment motion.

Defendant Trustees' Motion to Strike Affidavits and Other Exhibits from Plaintiff's Response [DE 50] is GRANTED IN PART with respect to the affidavits of Buggs, Sprouse and Jenkins, and is OTHERWISE DENIED.

Defendant Trustees' Motion for Summary Judgment [DE 37] is GRANTED. The Clerk shall enter judgment in favor of Defendant Trustees and against Plaintiff Assibey-Mensah on all claims asserted in his First Amended Complaint.

**SO ORDERED**.

ENTERED: March 7, 2016

/s/ Philip P. Simon
**PHILIP P. SIMON, CHIEF JUDGE**